ISMAIL J. RAMSEY (CABN 189820)
United States Attorney

MARTHA BOERSCH (CABN 126569)
Chief, Criminal Division

EVAN M. MATEER (CABN 326848)
Assistant United States Attorney

    1301 Clay Street, Suite 340S
    Oakland, California 94612
    Telephone: (510) 637-3680
    FAX: (510) 637-3724
    Evan.mateer@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 4:24-mj-71007-MAG |
|    Plaintiff, | **MEMORANDUM IN SUPPORT OF THE UNITED STATES' MOTION TO DETAIN** |
|    v. | |
| TOBIAS SCOLLAY, | |
|    Defendant. | |

## INTRODUCTION

Tobias Scollay is a violent sex trafficker who abused and exploited four victims, including three minors aged 13, 15 and 17. Scollay sexually abused two of the minor victims, and physically assaulted an adult victim. Scollay's abusive conduct was not even deterred by incarceration: he continued to engage in sex trafficking when in state custody. Given Scollay's egregious conduct, long criminal history, and his persistence in trafficking even when in custody, there are no conditions of release that can protect the community. Scollay must be detained pending trial.

# BACKGROUND

In June and July 2023, Scollay sex trafficked three minor victims, aged 13 (Minor Victim 1 or MV1), 15 (Minor Victim 2 or MV2), and 17 (Minor Victim 3 or MV3). He also trafficked an adult, D.M., who was 19 years of age, using force and threats of force to coerce her into continuing trafficking with him. Scollay's exploitation of the minors did not stop with commercial gain; he sexually abused both the MV1 and MV2. Nor did Scollay's activities cease after he was arrested on separate charges. While incarcerated, Scollay used jail calls to direct MV2 to engage in commercial sex work and to engage in sexual acts on a video chat.[1]

**A. In June 2023, Scollay recruited Minor Victim 2 to engage in commercial sex work**

In early June 2023, Scollay contacted MV2 in Los Angeles and recruited her to engage in commercial sex work. MV2 was 15 years old and had recently run away from home and become engaged in commercial sex work to make money. At that time, MV2 had been engaged in commercial sex work for another trafficker for a few weeks. Despite working for another trafficker, Scollay was "sweating" MV2—that is trying to recruit her to engage in commercial sex work on his behalf. MV2 explained that Scollay "got out of his car and started coming up to [her] face and started chasing [her]," and that he was hugging her, grabbing her buttocks, and rubbing on her. MV2 said she walked away because she was following the rules of her current trafficker, but that she thought he was cute. When MV2 had finished working, she texted Scollay, who then met MV2 at her hotel. The next day, MV2 "went home" with Scollay, which is vernacular for leaving her previous trafficker to join him. That evening, Scollay had oral and vaginal sex with MV2.[2]

The next day, MV2 left Los Angeles with both Scollay and D.M. and went to Oakland. Scollay took MV2 and D.M. to a hotel room at the Oakland Airport Executive Hotel and made MV2 pay a "choose up fee," which is a fee to demonstrate she was ready to work with him. MV2 got the money from the commercial sex dates she had engaged in the previous night while she was still working for her

---

[1] This memo lays out the offense conduct in summary form. For detailed description of the o factual allegations against Scollay, *see* Affidavit in Support of Criminal Complaint, Dkt. 1.

[2] Scollay admitted to having sex with MV2 on a November 6, 2023 jail call.

prior trafficker. Scollay used this money to buy an outfit, high heels, and condoms.

After arriving in Oakland, Scollay put MV2 and D.M. "down" on the blade to engage in commercial sex acts beginning around 7:00 PM. He drove them to the blade in his white Mercedes and left after he dropped them off. MV2 explained that once she "caught a date" she would communicate with Scollay as she got into the vehicle. She would text him, and he would respond "ok." After the date, MV2 would provide Scollay with the money she received.

MV2 said her dates were "car dates," which meant she would engage in sex acts in a vehicle. She said that she would engage in oral sex and/or vaginal sex with a condom. She said that customers were supposed to have 15 minutes, but that she only gave them about 5 minutes. She also explained that sometimes she would charge customers more money, pocketing the difference between what the customer paid and what Scollay expected to collect.

MV2 explained that when she told Scollay she had a date, he would "break on her," which meant coming to take the earnings from the date. MV2 explained that she made approximately $1,000 from commercial sex dates over her two nights working for Scollay in Oakland. MV2 explained that Scollay kept all the money for himself, using some to purchase clothing for MV2 and to pay for the hotel. MV2 engaged in sex work for Scollay on two nights.

**B. After bringing MV2 to Oakland, Scollay recruited Minor Victim 1 to engage in commercial sex work**

On or about June 12, 2023 (and shortly after bringing MV2 to Oakland), Scollay recruited MV1—who was 13 years old—to engage in commercial sex work for him. As with MV2, Scollay first approached MV1 when she was with another trafficker in Vallejo. MV1 did not "go home" with Scollay that day. But sometime thereafter, MV1 left her previous trafficker after he accused her of stealing her wallet. She went to the Oakland blade, and Scollay approached her again. This time, MV1 agreed to "go home" with Scollay. Scollay took MV1 with him when he went to pick up MV2 and D.M., who were both working on the blade. Scollay brought MV1 back to the hotel room, where he had oral and vaginal sex with her without a condom. MV1 recalled that during sex with Scollay, MV2 was in the room sleeping in another bed, while D.M. was outside. MV2 also reported that Scollay had sex with MV1 while she was in the room. Scollay took money from MV1, which he used to purchase MV1

an outfit. MV1 was recovered from the Oakland Airport Executive Hotel on June 14.

### C. Scollay recruited Minor Victim 3 to engage in commercial sex work

In May and June 2023, Scollay also recruited MV3 to engage in commercial sex work. MV3 was 17 years old, and in May had run away from home in Nevada. Like MV1 and MV2, MV3 was also engaged in commercial sex work for another trafficker. Nevertheless, Scollay made frequent attempts to get her to "come home" with him. Scollay would attempt to recruit her in person on the Blade, as well as on her Instagram. Scollay's Instagram includes numerous messages with MV3 from this period. For example, Scollay sent the following message to MV3: "I'm really tryna fw yu my girl really like yu we was disappointed when we didn't see yu again last night **but I know we can all be a good team together** yu just gota let me come get yu." (Emphasis added).

Scollay—working with D.M.—was successful in enticing MV3 to engage in one commercial sex date in June 2023. D.M. convinced MV3 to come to Scollay's vehicle. Scollay then dropped MV3 off at the Blade, and that she understood she was supposed to engage in a date and bring him back the money. MV3 engaged in a sex date and received money but did not bring the money to Scollay. Instead, she gave the money to another trafficker. Scollay continued to harass her after this sex date, up until about 3 or 4 days before she was recovered by police.

### D. Scollay physically abused Adult Victim 1

From at least May 2023 until at least July 2023, Scollay also trafficked an adult victim, 19-year-old D.M. In a jail call on July 7, 2023, Scollay described for MV2 physically abusing D.M. when she was "out of pocket"—that is, not following the rules—for speaking with another man that Scollay believed to be another trafficker. Scollay described his reaction:

> "I pulled up on them trippin. And then I pulled up--I'm like, I'm like...you know what I had on me? and I pulled it out like 'Nigga I bust on you and that bitch on G-O-D--pull that shit over bruh' and he pulled over and I'm like '[DM], get out the car' and on my momma she try to...naw, i aint gonna say none of that. She hopped out the car and start trying to get low like (unintelligible) running. Yeah. and I'm like, I'm like, 'Yeah bitch, now you ge☐n chalked' and I was like, I was like 'Yeah bitch, now you getin chalked' and I ran up and i slapped her. Knocked her off her feet. And then she was on the floor and I picked her right up and i was like 'Come on' brought her to the car, you feel me? And then she got into the car . . . I didn't drag her. I picked her up. I.. I…dropped her, I hit her with the slap, she fell, I picked her back up, you feel me? and walked her to the car."

**E. Scollay used jail calls to continue sex trafficking and exploiting MV2 while incarcerated**

On June 19, 2023, not long after D.M. and MV2 left Scollay and MV1 was recovered, Scollay was arrested in Los Angeles for an aggravated assault that Scollay committed in San Francisco. Scollay remained in custody in various facilities until February 2024. During this time, Scollay made numerous audio and video calls to both MV2 and D.M. in which he persisted in directing MV2 to engage in sex work on his behalf.

For example, on June 5, 2023, Scollay called MV2 from jail and instructed her to get a hotel room, and that he wanted her to "trap" from the room. MV2 said that she did not want to work the blade without anyone watching for her. Scollay said that that is why she will "play the net"—understood to mean advertising commercial sex services on the internet. MV2 said she didn't have an account to do an online advertisement. Scollay said that she would have to go "outside"—that is, to the blade—but that she would go with D.M. and so would be safe. MV2 said that she did not have identification to get a room. Scollay said he would ask D.M. to help MV2 get identification.

At 3:00 PM on July 5, Scollay again called MV2, and again directed her to engage in commercial sex work. MV2 initially said she was planning on going back to LA until Scollay got out of jail. Scollay said that he wanted her to "run it up for me." MV2 said she would save her money for Scollay. Scollay said that is what he wanted her to do: "just run it up, max my books[.]" He asked MV2 to not begin working with another trafficker, but to wait for him. He tells MV2 to "go play the net." MV2 again says that she cannot get a room because she doesn't have identification. Scollay tells her to have a date book a room under their name, and then she can continue to pay for it. MV2 also says she can't post advertisements online because she doesn't have an account. Scollay told her not to go to LA. MV2 said that she would work for him in LA and would send him money via CashApp every time she got a trap.

At 12:00 PM on July 6, Scollay called MV2. Scollay again asks MV2 to not work with another trafficker, but to "come home" with him. MV2 confirms that she wants to wait for him, but that she did not know how to get a room. Scollay again said that she should have a date get a room, and then keep paying for it. Scollay told MV2 she should go to the DMV and get a license, adding "because you

MEMORANDUM IN SUPPORT OF THE UNITED STATES' MOTION TO DETAIN    5
4:24-mj-71007-MAG

eighteen, right?" MV2 responded: "Mmm. Hmmm" (in the affirmative).  Scollay said he would have someone help MV2 make a profile to advertise on the internet, and MV2 said she would have "a bag" waiting for Scollay when he got out.  Scollay instructed MV2 to take a bus back to Oakland and to get a room at the Oakland Airport Executive Hotel.  MV2 said that she was currently getting dressed and getting ready to make money for him, presumably by engaging in commercial sex work.

On July 7, 2023 at around 8:30 PM, Scollay again called MV2.  Scollay asked MV2 why she had not put money on his books yet.  MV2 said that she had to "make trap" first.  Scollay told her "tonight"—understood to mean she should engage in sex work tonight to make money and provide it to Scollay on his prison account.

On June 13, 2023, Scollay called D.M. and the two discussed MV2.  Scollay was concerned MV2 was working for someone else since he had not heard from her in several days.  D.M. said that she was staying at her mother's house and that nobody would give her a ride to Oakland.

On November 3, 2023, Scollay called MV2 at approximately 12:00 PM.  MV2 told Scollay that she had spoken to law enforcement, and that they had shown her pictures of Scollay, D.M., and MV1, and had asked her what happened in Oakland.  MV2 said that she told law enforcement that she did not know who Scollay was and had never been to Oakland and had never been paid by Scollay.

The conversation between MV2 and Scollay continued with another phone call at 2:31 PM.  Scollay asked for more details about MV2's discussions with law enforcement.  After asking MV2 about the photographs that law enforcement presented to MV2, Scollay said, ""I think it's probably that room we were staying at." MV2 responded, "yeah, that's what I'm sayin bro…cuz we was doin shit in the hallways." Scollay then stated, "man gotta move careful, girl…thank God I ain't got a case or nothing like that, you feel me? If it was bad for me, for real, I'd have been got fingerprinted and I would have been already known I got some shit."

On November 7, 2023, Scollay called MV2 around 8:00 AM.  Scollay again told MV2 to get a different phone because law enforcement has the number and may "see we talking and shit."  MV2 told Scollay law enforcement had been through her phone.  Scollay asked MV2 if "when I come home, you gonna slam some money for me."  MV2 said she would.  Scollay asked her how much money she could make over the weekend.  MV2 said she could make a "band," understood to mean $1,000.  Scollay told

her that if she made $1,000 she should "put like $600 on the side if you can . . . just to keep the stack up" and to keep $400 for herself. Scollay said that "depending on what you make, I'm gonna let you know what to put to the side."

Scollay called MV2 again on November 7 at approximately 12:46 PM. Scollay spoke at length asking MV2 to "fuck with him" when he got out of jail so they could "really run it up."

On November 8, 2023, Scollay called MV2 at approximately 1:47 PM. Scollay told MV2 that she needed to "go out there" and "show me that you really doping something." He said "I want you to have something when I come home" including a "spot" and a "web." He complained that MV2 was "not actually doin nothin" and told her that she need "to get a bag right now." Scollay then asked more questions about MV2's interactions with law enforcement. He again told her to get a new phone and asked whether she was working with the police. MV2 denied it.

On November 9, 2023, Scollay called MV2 at approximately 7:15 PM. Scollay expressed his desire to have sex with MV2 when he was released from jail. On November 16, 2023, Scollay had several calls with MV2 that were sexual in nature and suggested that MV2 should do sex acts on a video call with Scollay.

On November 20, 2023, Scollay called MV2 at approximately 9:06 AM and discussed her sex work. He criticized MV2 for only going out on weekends and said that she could make nearly $1,000 by going out three times a week. Scollay then reflected on the events that led to him being in jail, and noted that if he hadn't brought back MV1 this would not have happened. Scollay then told the story of how MV1 ended up with him. MV2 then explained why Scollay bringing in MV1 had made her angry, including that MV1 had not paid a fee like MV2 had.

On November 24, 2023, Scollay called MV2 and told her to "run up a bag for" him. He told MV2 to "run it up for him" the next two months and show him she's "rockin" for him.

On December 3, 2023, at approximately 1:35pm, Scollay called MV2 from jail and an approximately 8-minute video ensued. During the video MV2 showed Scollay money and Scollay asked her how much she had and then told her she could have more than that saying, "I'm tryna have you runnin it up baby. You could have way more pape than that."

MEMORANDUM IN SUPPORT OF THE UNITED STATES' MOTION TO DETAIN         7
4:24-mj-71007-MAG

**F. While incarcerated, Scollay enticed MV2 to engage in sexual acts on a live video call**

On November 28, 2023, at approximately 8:07pm, Scollay called MV2 and an approximately 4-minute video ensued. During the video call, Scollay asked MV2 what she had on and she began to masturbate for Scollay. Scollay directed her to show different parts of her body and encouraged her to masturbate for him.

Scollay was released from state custody in February 2024. On July 2, 2024, he was charged by complaint with violations of 18 U.S.C. § 1591 – Sex Trafficking of a Minor and 18 U.S.C. § 371 – Conspiracy. He made his initial appearance on the complaint on August 2, 2024.

## CRIMINAL HISTORY AND PRIOR CONDUCT

Scollay has a long and substantial criminal history dating back to at least 2013. Indeed, his entire adult life has been spent in and out of jail on felony convictions, including multiple violent and firearms offenses. His convictions and sentences are summarized in the following chart:

| Date | Court | Offense | Sentence |
|---|---|---|---|
| 03/01/2013 | Oakland | CPC 243(b) Battery; CPC 148(A) Resist Arrest | Juvenile Hall |
| 04/10/2013 | Alameda | CPC 415(3) Offensive Words | 90 days probation |
| 12/05/2013 | Alameda | CPC 496(A) Receipt of Stolen Property | 12 months probation |
| 01/15/2014 | Santa Clarita | VC 21201(D) Vehicle Headlight Violation | Juvenile Hall |
| 06/02/2016 | Woodland | CPC 490 Petty Theft | Citation |
| 09/07/2016 | Contra Costa | CPC 245(A)(4) Assault with a Deadly Weapon | 180 days jail; 2 years probation |
| 04/25/2018 | San Francisco | CPC 242 Battery; CPC 647(A) Solicitation | 30 days jail; 3 years probation |
| 09/05/2019 | Santa Clara | CPC 487(A) Grand Theft | 90 days jail; 3 years probation |
| 01/14/2020 | San Jose | CPC 487(A) Grand Theft; VC 14601.1(A) Driving on Suspended License | 6 months jail; 2 years probation |
| 11/06/2020 | Pittsburg | CPC 243(A) Battery | 60 days jail; 3 years probation |
| 02/11/2021 | Manteca | CPC 459 Burglary | 364 days jail; 4 years probation |
| 12/01/2022 | Sacramento | CPC 487(A) Grand Theft | 8 months prison |
| 01/05/2022 | Los Angeles | CPC 29800(A)(1) Felon Possession of Firearm | 16 months prison |
| 07/13/2022 | San Rafael | CPC 459 Burglary | 16 months prison |
| 02/07/2023 | Oakland | CPC 459 Burglary | 100 days jail; 2 years probation |

In addition to his many convictions, Scollay has many arrests that did not result in charges.

Furthermore, he is currently being prosecuted in San Francisco for assault on an elderly individual. Scollay failed to appear for his last court date and is subject to a non-citable bench warrant in that matter. The government understands that the state intends to ask that Scollay be detained pending.

## ARGUMENT

### I. LEGAL STANDARDS

The Bail Reform Act of 1984 permits pretrial detention of a defendant without bail where "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e). Detention is appropriate where defendant is either a flight risk or a danger to the community; it is not necessary to prove both. *United States v. Motamedi*, 767 F.2d 1403, 1406 (9th Cir. 1985). While a finding that a defendant is a danger to the community must be supported by clear and convincing evidence, 18 U.S.C. § 3142(f), a finding that a defendant is a flight risk need only be supported by a preponderance of the evidence. *Motamedi*, 767 F.2d at 1406.

In determining whether pretrial detention is appropriate, the court must consider information regarding the nature and circumstances of the charged offense; the weight of the evidence; the danger posed by the defendant to any person or the community; and the history and characteristics of the defendant. 18 U.S.C. § 3142(g).

### II. SCOLLAY IS A DANGER TO THE COMMUNITY AND A FLIGHT RISK

Scollay's long criminal history, his violent and abusive conduct alleged in the complaint, and his persistence in attempting to trafficking a minor *even when incarcerated* all make clear that Scollay is serious danger to the community, and that no set of conditions can adequately mitigate that danger.

#### A. The Nature and Circumstances of the Offense Weigh in Favor of Detention

Scollay's egregious conduct in this case makes him a serious danger to the community. Scollay's commercial sex trafficking has caused untold damage to three minor victims. These victims—13, 15, and 17 years old—were already vulnerable when Scollay encountered them. Scollay heartlessly exploited this vulnerability to gain control over his victims and sold access to their bodies for his own commercial gain. Nor did Scollay stop when he had already recruited one young girl. Over the course of only about two

months, Scollay victimized three separate victims. Had not been arrested for his assault charge, there is every reason to believe that he would have continued to find and exploit more vulnerable girls. Nor did Scollay stop at exploiting his victims for commercial gain. He also exploited them for his own sexual gratification. He sexually abused both MV1 and MV2. And like his rapid-fire sex trafficking, Scollay sexually assaulted MV1 and MV2 within days of one another. Scollay's coercive and exploitative conduct has already been destructive to the childhood of three young girls. Releasing Scollay would pose an unacceptable risk that he will victimize more minor girls in the most terrible ways.

Furthermore, Scollay's persistence in trafficking MV2 while incarcerated makes clear that there are no conditions the Court can impose that will adequately protect the community. Incarceration is the most restrictive option the criminal justice system has to protect the community. But even from jail, Scollay made many attempts over nearly six months to convince MV2 to engage in commercial sex work on his behalf. Over the same time, he continued to conspire with D.M. to the same end, asking her to help MV2 get back to Oakland and to set up in a hotel room so she can begin working. Scollay did all of this despite knowing that his jail calls were recorded. And he continued even after MV2 told him that she had spoken with investigators about his conduct. In short, nothing has deterred Scollay—not being in jail, not the threat of his conduct being recorded, not even knowledge of an investigation into him. Given that, there is no reason to believe that *less* restrictive conditions would stop his incessant desire to traffic minors.

### B.  Mr. Fowler's Criminal History and Prior Conduct Demonstrate the Danger that He Poses and that He is a Flight Risk

Scollay's criminal history confirms that he is a danger to the community and that he should be detained pending trial. He has been involved in crime his entire adult life. He has numerous prior felonies, including assault with a deadly weapon, illegal firearms possession, and numerous burglaries. He has also been subject to numerous other arrests for a variety of other crimes, some violent and others involving firearms, that did not result in convictions. In short, Scollay has rarely gone a significant amount of time without a serious encounter with law enforcement. If released pending trial, there is a substantial danger that this trend will continue. Scollay criminal history further underscores that there are no conditions of bail can adequately protect the public. He has a long history of non-compliance with terms of probation or community supervision. Accordingly, Scollay will not comply with terms and conditions of release set

by this court. Similarly, Scollay's previous issues complying with supervision indicates a flight risk.

### C. The Weight of the Evidence Against Scollay is Overwhelming

Scollay faces overwhelming evidence that committed the charged crimes. Aside from the testimony of his victims and contemporaneous text and Instagram messages, Scollay has admitted to his trafficking crimes on recorded jails calls. He also admitted on recorded jail calls that he physically abused D.M. when she talked to another trafficker, and that he sexually assaulted both MV1 and MV2. Given these recorded admissions, Scollay's conviction is a near certainty. Moreover, his exposure in this case is extremely significant, with a 10-year minimum sentence, a maximum sentence of life, and a preliminary guidelines calculation of 324 months to life.

While the weight of the evidence factor is the least important, the Court is still "require[d]" to consider it, and it can help to establish the dangerousness of the defendant. *United States* v. *Hir*, 517 F.3d 1081, 1090 (9th Cir. 2008) (finding that "the weight of the evidence clearly and convincingly establishe[d]" a likelihood that the defendant would pose a danger if released). Likewise, overwhelming evidence of the defendant's guilt "makes it more likely that he will flee," since the defendant has less incentive to litigate the case. *United States* v. *Gebro*, 948 F.2d 1118, 1122 (9th Cir. 1991). In this case, the overwhelming evidence indicates both that Scollay may flee to avoid certain conviction, as well as the clear and present danger that he poses to the community.

### CONCLUSION

For the foregoing reasons, the United States respectfully asks the Court to order Scollay detained.

DATED: August 8, 2024                                                             Respectfully submitted,

                                              ISMAIL J. RAMSAY
                                              United States Attorney


                                              ___*/s/ Evan M. Mateer*_____
                                              EVAN M. MATEER
                                              Assistant United States Attorney